John A. Piskora (JP-1224)
LOEB & LOEB LLP
345 Park Avenue
New York, New York 10154-1895
212-407-4000
*Attorneys for Petitioner*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------X

POAP CORP. d/b/a EXCHANGE PLACE,

                        Petitioner,

          -against-

ADEXIAL LLC.,

                    Respondent.

------------------------------------------------------------------------X

**07 CV 11447**

No.: _____

**NOTICE OF PETITION TO**
**CONFIRM ARBITRATION**
**AWARD**

        PLEASE TAKE NOTICE, that on the annexed Petition of POAP Corp. d/b/a Exchange Place ("Exchange Place"), dated December 20, 2007, and the accompanying declaration of Shelly Elimelekh, the undersigned will petition this Court at the United States Courthouse, 500 Pearl Street, New York, New York, on January ____, 2008, at ____, or as soon thereafter as counsel can be heard, for an Order pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 6, 9: (i) that judgment be entered confirming a final and duly issued American Arbitration Association ("AAA") arbitration award in Petitioner's favor and against Respondent; and (ii) for such other and further relief as the Court may deem just and proper, together with costs, disbursements and attorneys' fees of this application.

Dated:  December 20, 2007
        New York, New York

LOEB & LOEB LLP

By: _____

John A. Piskora (JP-1224)
345 Park Avenue
New York, New York 10154-0037
Telephone:  (212) 407-4000
Facsimile: (212) 407-4990

*Attorneys for Petitioner*

NY693732.1
205552.10002

John A. Piskora (JP-1224)
LOEB & LOEB LLP
345 Park Avenue
New York, New York 10154-1895
212-407-4000

*Attorneys for Petitioner*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
POAP CORP. d/b/a EXCHANGE PLACE,

               Petitioner,

       -against-

ADEXIAL LLC.,

            Respondent.

-----------------------------------------------------------X

:

: **No.:** _____

**PETITION TO CONFIRM**
: **ARBITRATION AWARD**

:

      Petitioner POAP Corp. d/b/a Exchange Place, by its attorneys Loeb &
Loeb LLP, for its Petition alleges and shows as follows:

      1.    Petitioner POAP Corp. is a corporation organized and existing
pursuant to the laws of the State of Delaware with its principal place of business in
New Jersey.  Respondent Adexial LLC is a Florida Limited Liability Company
with its principal place of business in Florida  There is complete diversity of

citizenship between the Petitioner and the Respondent and the amount involved in this proceeding exceeds $75,000, exclusive of interest and costs.

2.     Venue is proper because this District is specified in the parties' contract for arbitration proceedings, this is the District in which the arbitration was held, and this is the United States Court in and for the judicial district in which the arbitration award was made.

3.     On November 13, 2007, Petitioner and Respondent entered into a written service agreement, whereby Respondent agreed to pay Petitioner for certain qualified leads for diabetes products as a Lead Purchaser.  Their written agreement consists of the following three parts: (1) Exchange Place Seller Program Terms and Conditions, (2) Infinity Program Rider, and (3) Insertion Order, (collectively referred to herein as, the "Service Agreement").  A copy of the Service Agreement is attached as Exhibit "A."

4.     The Service Agreement provides that any disputes between the parties with respect thereto would be resolved by binding arbitration.

5.     Prior to June 7, 2007, a dispute arose between the parties that was subject to the arbitration provision of the Service Agreement.  In brief, Respondent did not pay Petitioner for its services rendered pursuant to the Service Agreement for the period from late November 2006 to January 2007, resulting in an unpaid account balance of $173,062.40.

6.    Pursuant to the arbitration provision of the Service Agreement, on June 7, 2007, Petitioner duly commenced an arbitration, upon notice, against Respondent.

7.    As provided by the parties Service Agreement, the American Arbitration Association properly designated a sole arbitrator to hear the dispute.

8.    Although Respondent failed to respond to the Arbitration Demand, the Arbitration proceeded in accordance with applicable AAA rules. Ultimately, Petitioner submitted evidence sufficient to establish its claims for relief and asked the arbitrator to issue an appropriate final award.  On November 15, 2007 the sole, properly-appointed arbitrator hearing the dispute issued a final Arbitration award (the "Arbitration Award").  A copy of the Award is attached as Exhibit "B."

9.    Respondent has not voluntarily satisfied the Arbitration Award. Therefore, a judgment on the Arbitration Award is necessary or desirable in order to permit Petitioner to enforce it.

10.    This Petition is filed within one year after the Award was made.

**WHEREFORE**, Petitioner prays that:

1.     This Court make an order confirming the Arbitration Award and directing that judgment be entered in favor of Petitioner against Respondent, in the amount of $197, 985.83 together with interest thereon at the rate of interest of 9% per annum from November 15, 2007 to the date of judgment;

2.     Judgment be entered conforming to the Arbitration Award; and

3.     Petitioner be awarded its costs and disbursement of this proceeding.

Dated:   New York, New York
         December 20, 2007

                              Loeb & Loeb LLP

                              Attorneys for Petitioner

                              By:_____

                              John A. Piskora (JP-1224)
                              345 Park Avenue
                              New York, New York 10154-0037
                              212-407-4000
                              Fax 212-407-4990

# EXHIBIT A

Exchange Place Seller Program Terms & Conditions

These Terms and Conditions ("T&C") are entered into by and between the individual, company or other business entity (as applicable) that signs these T&C or any document that references these T&C, or that accepts these T&C electronically ("you"), and POAP Inc. d/b/a Exchange Place ("Exchange Place" or "EP" or "we"). These T&C govern your participation as a Lead Purchaser (as defined below) in EP's Lead Generation and Bidding System that is further described below. These T&C (which shall include any documents incorporated herein and any amendments or riders hereto), any insertion orders to which these T&C apply and your Application (as defined below) may be referred to herein collectively as the "Agreement". EP and you may sometimes be referred to in these T&C as a "Party" and collectively as the "Parties". For good and valuable consideration, receipt of which is hereby acknowledged, the Parties hereby agree as follows:

1.  Description of the "Service"; Definitions. EP will deliver leads to you and other participating individuals and businesses (collectively, "Lead Purchasers") who may acquire such leads in accordance with the terms hereof. Consumers ("Consumers") share "Personal Information" (which may include their interest in purchasing certain goods and services, and contact, financial and other types of information) and consent to be contacted by telephone and/or email by responding to questions through direct response channels. If the Personal Information meets various criteria (including Lead Purchaser(s)' selected lead qualification criteria), such Personal Information will be deemed a "Qualified Lead". Lead Purchasers select from a list of criteria provided by EP to receive a Qualified Lead. These criteria may include broad or refined "Lead Types" (sub-sets of Lead vertical categories). Each Lead Type with associated criteria is referred to as a "Qualified Lead Listing". Qualified Leads are matched with Qualified Lead Listings through the EP "Qualification System" to identify eligible Lead Purchasers with respect to particular Qualified Leads. Lead Purchasers enter bids for Qualified Lead Listings to compete for Qualified Leads sold through EP (the "Bid System"). When a Qualified Lead is submitted to the Bid System, it shall be awarded to the eligible Lead Purchaser(s) who have entered the highest bids for such Qualified Lead ("Top Bidders"). The maximum number of Top Bidders for any Qualified Lead (and any other issue regarding the highest bids) shall be determined by EP in its sole discretion; provided, that such number shall be at least two (2) whenever possible. For a more detailed description of the operation of the Service and our Bid System (including selecting Qualified Lead Listings, bidding for Qualified Leads, adjusting or cancelling bids, timing issues and related rules and policies), please see our "Overview of the Service" located at www.exchangeplace.net/overviewofservice, which is hereby incorporated into these T&C by reference.

A.  Additional Specifications. Any rules, procedures, policies or other specifications regarding the Qualification System, Bid System or any other aspect of the Service (collectively, the "Specifications") not expressly set forth in the Agreement shall be determined by EP in its sole discretion, and EP may post such Specifications on the Lead Purchasers' area of the EP web site(s) and/or online interface(s) through which Lead Purchasers, Consumers and other users access the Service (collectively, the "Web Site") or otherwise communicate such Specifications to Lead Purchasers. EP shall have the right to implement new Specifications, or add to, remove or otherwise modify any then-

existing Specifications, from time to time, subject to Section 16. You must comply with all Specifications, which shall be deemed incorporated into these T&C by reference. The Service includes all services and features provided by EP to Lead Purchasers and Consumers through EP representatives, the Web Site or any other web site, and any and all software and other technology used to operate the Web Site and any other part of the Service.

2.  Enrollment and Approval. To participate in the Service, EP may require you to complete and submit an account application form, a certification form and/or any other information that EP deems necessary (collectively, your "Application"). Your submission of your Application to EP does not obligate EP to do business with you. Potential Lead Purchasers and Lead Purchasers' Qualified Lead Listings are subject to EP's approval, and EP may deny any party the right to participate in the Service for any reason, in EP's sole discretion. Any EP approval shall not release you from any obligations or liability hereunder and may be revoked by EP at any time.

3.  EP's Limited Role. You agree that:

A.  EP is not a lender, mortgage or real estate broker, financial institution or provider of any products and services other than the Service. EP does not endorse or recommend products or services of any Lead Purchaser or any Consumer's need for any product or service. EP's services are administrative only. By providing the Service, EP is not soliciting or providing assistance to Consumers for any particular product or service, or engaging as an agent, or (except as may otherwise specifically be agreed) advertising, on behalf of any Lead Purchaser.

B.  Beyond providing you with Qualified Leads (if you are a Top Bidder therefor) as described above so you may directly contact the Consumers identified by such Qualified Leads, EP has no control or oversight over, and will not participate or be involved in or assist with, your communications, negotiations, transactions, agreements or other dealings (collectively, "Dealings") with any Consumers. Dealings with any Consumer are solely between you and such Consumer. It is your sole responsibility to establish, communicate, discuss, negotiate and/or modify (as you deem advisable) the terms and conditions of any offer or transaction you propose to a Consumer, and to ensure that your Dealings with any Consumer do not violate any applicable Laws (as defined below), including those regarding the age, jurisdiction or other characteristics of such Consumer.

C.  Neither EP nor any EP Parties (as defined below) will be responsible or liable for any damages, costs, expenses or other loss or liability of any sort arising out of or in any way connected with (i) your Dealings with any Consumer (including your reliance on any information or communications provided by such Consumer, any Consumer complaints or other actions related to your products or services, and any determination by any court, regulatory agency or other government or non-government organization that any transaction between you and such Consumer is illegal or otherwise invalid), or (ii) any other act or omission of any Consumer. Your Dealings with Consumers and their use of any of your products or services is at your sole risk.

4.  Compensation and Payment. Unless the Parties otherwise agree, prior to using the Service, you must designate a credit card,

checking or other account from which all amounts owed by you to EP hereunder shall be paid (your "**Account**"). Following the end of each designated monthly period, EP shall debit or otherwise charge your Account for all awarded bids, plus any interest and other amounts you owe EP. By using the Service, you authorize EP to so debit or otherwise charge your Account for all such amounts. Any invoice (if any) that EP may send you shall be due within thirty (30) days from the date on such invoice. You shall pay all applicable federal, state and local sales, use, value added, excise and other taxes and duties of any nature assessed with respect to your use of the Service, including any sales tax that EP must collect on any amounts payable by you. If you fail to pay any amounts due to EP by the date due (whether because there are insufficient funds in your Account or otherwise), you will be liable to EP for interest at the lesser of eighteen percent (18%) per annum or the then-highest legal rate on all amounts owed, from the date of indebtedness until paid. In the event that EP incurs any penalties or other fees resulting from insufficient funds in your Account, you shall immediately reimburse EP the full amount of such penalties and fees. EP also has the right to charge you for all costs of collection, including collection agency and attorneys' fees and court costs. You hereby authorize EP to verify your credit card or other Account information, confirm that your Account balance is adequate, perform credit checks and otherwise investigate your credit record as EP deems necessary or advisable. You shall provide such further financial information and documentation as EP requests at any time as a condition for your participation in the Service. Subject to Section 4.A, you must submit any claims or disputes with respect to any Account charge in writing to EP within sixty (60) days of such charge, or such claim or dispute will be waived and such charge will be final and not subject to challenge.

A. <u>Refund Requirements</u>. Except as expressly provided herein, if you are a Top Bidder for any Qualified Lead, your bid amount for such Qualified Lead is binding and non-refundable, and you hereby agree to pay such bid amount to EP. However, if you suspect that a Qualified Lead does not contain Personal Information for a Consumer necessary to contact the Consumer, you may notify EP thereof within ten (10) days of your receipt (or the receipt by a third party acting on your behalf, if earlier) of such Qualified Lead. If EP receives such notice from you within such ten-day period, we shall investigate such Qualified Lead and notify you of the results thereof within ten (10) business days. If we determine that such Qualified Lead was valid, we shall send you a written explanation. If the investigation reveals that the Qualified Lead was not valid, we shall credit your Account for the amount that you paid for it. Valid Qualified Leads include Consumers: who have agreed to transact business with a competing Top Bidder by the time you establish contact with such Consumer; with whom you establish contact who become uninterested for any reason; with valid contact information who refuse to respond back to you; and with whom you establish contact who provide false or misleading data. We shall not credit your account for failures to receive Qualified Leads due to email restrictions such as SPAM filters and technological errors initiated by changes to your Information Technology environment. If you cease to receive awarded Qualified Leads, you must contact us within forty-eight (48) hours to be eligible for a credit for the awarded Qualified Leads should we determine that the cause of the problem is due to technological errors in our Information Technology environment.

B. <u>Ad Sales Partner</u>. If we permit a third party (an "**Ad Sales Partner**") to use the Service and bid for Qualified Leads on your behalf, and/or to make payments to us on your behalf for Qualified Leads (subject to all Specifications and other terms that may apply to such Ad Sales Partner), the terms of this Section 4 shall apply to such Ad Sales Partner and not to you; provided, if such Ad Sales Partner fails to timely pay any amounts owing to us hereunder on your behalf (including any interest or fees), we have the right to invoice you directly for such amounts, and the terms of this Section 4 shall apply to your payment of such invoiced amounts. Any payment by you to any Ad Sales Partner shall not relieve you from your payment obligations to us.

5. <u>Your Use of Qualified Leads</u>

A. <u>Limited Use</u>. With respect to any Qualified Lead provided to you, except as expressly provided herein, you may use that Qualified Lead and all Personal Information contained therein solely to: (i) contact the applicable Consumer to offer to provide the specific products or services for which such Consumer submitted a request to EP ("**Requested Services**"); and (ii) obtain additional information from such Consumer, or about such Consumer from a third party (such as a credit reporting agency), if you need such information to determine whether or not to make an offer to such Consumer for such Requested Services or to determine the terms and conditions of any such offer. **You may make only one offer to such Consumer for such Requested Services, but if expressly requested by such Consumer, you may revise your original offer and re-contact such Consumer to make such revised offer.** For clarity, you shall never use any Qualified Lead or any Personal Information contained therein (i) to offer products or services other than the Requested Services, (ii) to market any products or services or otherwise engage in any marketing activities, whether by telephone, e-mail, direct mail or otherwise (including marketing the Requested Services after you have made your offer to the applicable Consumer), or (iii) for any other purpose not expressly permitted hereunder. You shall not share any Qualified Lead or any Personal Information contained therein with any third party, other than a service provider that may perform the activities permitted by this Section 5.A on your behalf (provided that you shall require such service provider to agree not to use such information for any other purpose). You acknowledge that your use of any Qualified Lead beyond the uses permitted hereunder may constitute a violation of telemarketing or other Laws. Notwithstanding the foregoing, if a Consumer accepts your offer for Requested Services or contracts with you to receive Requested Services, you may keep, use and share such Consumer's Personal Information as if you had collected such information directly from such Consumer. We may monitor your use of Qualified Leads provided to you to ensure your compliance with this Section, for example, by performing follow up surveys with Consumers and by tracking complaints.

B. <u>No Brokering</u>. Unless EP otherwise agrees in writing in advance, you will use any Qualified Lead solely as permitted herein, and are not acquiring such Qualified Lead to, and will not, sell the Qualified Lead to any third party or otherwise act as a broker with respect thereto.

C. <u>Breach</u>. If you breach this Section 5, EP shall have the right to seek disgorgement of any resulting revenues derived by you, in addition to any other rights or remedies available to EP.

6.  Your Representations and Warranties.  You represent, warrant and agree that:

A.  You have the full right and power to enter into this Agreement, perform all your obligations and grant all the rights granted by you hereunder, and your performance of such obligations and grant of such rights does not and will not conflict with any obligation you have to any third party.

B.  The information in your Application, and all other information you provide to EP, is and will remain during the term hereof, true, complete, current and correct in all respects, and you will promptly notify EP in writing of any updates or other changes to such information.

C.  In performing all your obligations under this Agreement, in conducting all Dealings with Consumers, and in otherwise conducting your business, you shall fully comply with all applicable federal, state, local, international and other laws, regulations and rulings, including those concerning intellectual property, unfair competition, unfair trade practices, deceptive advertising, privacy, direct marketing, e-mail marketing and telemarketing (collectively, "Laws"), and you shall not violate the proprietary, contractual or other rights of any third party.

D.  EP's use of your Marks as provided herein and of any other materials you provide to EP, including the messaging, image and URL you provide for your awarded Qualified Lead's Consumer confirmation page, shall not infringe any patents, copyrights, trademarks, trade secrets or other intellectual property rights of any third party.

E.  Your collection, sharing and other use of Qualified Leads, Personal Information and information that you collect from Consumers for whom you receive a Qualified Lead shall comply with (i) all Laws, (ii) EP's Privacy Policy (which you hereby acknowledge you have read and agree to abide by), (iii) your stated information-collection and other privacy practices, and (iv) this Agreement.

F.  You shall not (i) collude with any other Lead Purchaser to keep bid amounts down or for any other purpose, (ii) artificially increase bid amounts (including to increase any commissions or similar revenues from such bids to which you may be entitled), (iii) otherwise willfully manipulate bid amounts or engage in any fraudulent activity in connection with the Service, or (iv) otherwise knowingly interfere with the operation of the Web Site or the Service, or the participation therein or use thereof by any Consumer, any other Lead Purchaser or other third party.

G.  (i) You have all licenses, qualifications, permits, registrations and other authorizations and have satisfied any other licensing or similar requirements (collectively, "Authorizations") required for you to (A) conduct your business, (B) pay EP per the terms hereof, (C) participate in the Service and (D) offer and provide all products or services you offer through the Service (including any such requirements imposed by any state or other territory or jurisdiction as a condition to conducting your business and offering and providing such products or services therein), including posting or securing all bonds and other financial instruments or deposits required by any Laws; (ii) all Authorizations are and shall remain current, valid and in full force

and effect at all times while you use the Service; and (iii) you are not the subject of any governmental inquiry or investigation, or any legal proceeding, regarding your right or authorization to offer or provide any such products or services.  The foregoing includes any Authorizations required to be obtained and maintained under all Laws by your employees, contractors, agents or other personnel who will be contacting Consumers in connection with their requests, making offers to them, providing products or services to them or having any other Dealings with Consumers on your behalf.

H.  You will not select any Qualified Lead Listing (including Lead Types and geographic areas), or bid for any Qualified Leads that match such Qualified Lead Listing, or offer or provide products or services to Consumers identified by such Qualified Leads, if you do not have the required Authorizations, or if you know (or should have known) that it would violate any Law for you to do so.  For example only, you may not select a Lead Type if you do not have the required Authorizations to offer or provide products or services for such Lead Type, and you may not select a geographic area if you do not have the required Authorizations to offer or provide products or services to Consumers in such geographical area.

7.  EP's Disclaimers.  THE SERVICE IS PROVIDED "AS IS". EXCEPT AS MAY BE EXPRESSLY SET FORTH IN THIS AGREEMENT, EP MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED (INCLUDING WARRANTIES OF MERCHANTABILITY, TITLE, NON-INFRINGEMENT, OR FITNESS FOR A PARTICULAR PURPOSE, AND ANY WARRANTIES ARISING FROM A COURSE OF DEALING, USAGE OR TRADE PRACTICE) ABOUT THE SERVICE (OR ANY ELEMENT THEREOF), YOUR USE OF THE SERVICE AND ANY RESULTS THAT YOU MAY OBTAIN THEREFROM, OR THAT THE WEB SITE OR ANY OTHER ELEMENT OF THE SERVICE WILL OPERATE UNINTERRUPTED, SECURE OR ERROR FREE. THIS AGREEMENT IS NOT FOR A SALE OF GOODS.

Without limiting the foregoing:

A.  EP may (but is not obligated to) seek to confirm that Personal Information provided by a Consumer is accurate and that a Consumer's request for offers from Lead Purchasers is legitimate. However, EP makes no representation, warranty or guarantee that (i) any Personal Information EP provides to you is current, complete or otherwise accurate; (ii) any Consumer has sufficient financial resources, is of sufficient age, possesses any required legal or mental capacity, or is otherwise qualified, able and/or eligible, to purchase or obtain any products or services that you may offer to such Consumer or enter into any transaction or agreement with you; or (iii) any Consumer is a legal resident of the United States (or any state therein) or any other country.

B.  EP makes no representation, warranty or guarantee that any Consumer will purchase any products or services from you or enter into any transaction with you.  There is no minimum number of transactions with Consumers to be generated by your use of the Service.  EP is not responsible for the success of your use of Qualified Leads or the Service or your Dealings with Consumers, and (except as expressly provided herein) will provide no refunds if such use or such Dealings do not produce your desired results.

8.  Limitation of Liability.  IN NO EVENT SHALL EP BE LIABLE TO YOU OR ANY OTHER PARTY MAKING A CLAIM OR DEMAND THROUGH OR AGAINST YOU FOR ANY INCIDENTAL, SPECIAL, INDIRECT, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES, INCLUDING LOSS OF DATA, SERVICE, PROFITS OR GOODWILL, ARISING OUT OF, RESULTING FROM OR IN ANY WAY CONNECTED WITH THIS AGREEMENT OR THE SERVICE, UNDER ANY THEORY OF CONTRACT, TORT, STRICT LIABILITY OR OTHERWISE, EVEN IF EP HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.  IN NO EVENT SHALL EP BE LIABLE TO YOU, OR ANY PARTY MAKING A CLAIM OR DEMAND THROUGH OR AGAINST YOU, FOR MORE THAN THE AGGREGATE BID AMOUNTS ACTUALLY RECEIVED BY EP FROM YOU HEREUNDER WITHIN THE PRECEDING 12 MONTHS.  THIS LIMITATION OF LIABILITY SHALL NOT BE EXCEEDED, NOTWITHSTANDING THE NUMBER OF SUCH CLAIMS AND DEMANDS.  THIS LIMITATION OF LIABILITY SHALL BE EFFECTIVE NOTWITHSTANDING THAT YOUR AVAILABLE REMEDIES MAY FAIL OF THEIR ESSENTIAL PURPOSE.  YOU ACKNOWLEDGE AND AGREE THAT EP HAS ENTERED INTO THIS AGREEMENT IN RELIANCE UPON THE LIMITATIONS OF WARRANTY AND LIABILITY CONTAINED IN THIS AGREEMENT, AND THAT THE SAME FORM AN ESSENTIAL BASIS OF THE BARGAIN BETWEEN EP AND YOU.

9.  Term and Termination.  This Agreement commences on the date EP notifies you that you have been accepted for participation in the Service and ends when terminated by either Party for any reason, with or without cause, by giving the other Party notice of termination as per the terms hereof.  Upon any termination of this Agreement, you shall be responsible for any amounts owed by you to EP, and you authorize EP to charge your Account for all such amounts or otherwise invoice you for such amounts upon such termination.  EP expressly reserves the right to discontinue, suspend or terminate the Service (or any part thereof), or your ability to use any part of the Service (including your ability to make bids for certain types of Qualified Lead Listings) at any time and for any reason, without notice to you.

10.  Indemnification.  You shall indemnify, defend and hold EP and its parent, subsidiary and affiliated companies, and its and their officers, directors, employees and agents (collectively, the "EP Parties"), harmless from and against any and all third party claims, damages, actions (including by any government), proceedings, settlements (any settlement being subject to EP's prior written approval) and expenses (collectively, "Claims") arising out of or in connection with: (i) any breach or alleged breach of your representations, warranties or agreements herein; (ii) any Dealings between you (or any third party acting on your behalf or on whose behalf you act) and Consumers; (iii) your use of any Qualified Leads, Personal Information and/or any other use of the Service by you; or (iv) any products or services offered and/or provided by you, except to the extent that any such Claims arise from EP's breach hereof.

11.  Trademarks.  If you upload to the Web Site or otherwise provide to EP your name, logos, trademarks service marks or other marks (collectively, "Marks"), or any third party Marks, it shall be deemed a grant by you to EP of a non-exclusive, royalty-

free, worldwide license to use such Marks (including the distinctive lettering and format of such Marks) on the Web Site to reference or list you as a participating Lead Purchaser or a Top Bidder.  You also hereby grant EP a non-exclusive, royalty-free, worldwide, perpetual license to use your name without distinctive lettering or formatting for all purposes in the preceding sentence, and also to list you as a Service user in EP's internal, trade, sales and marketing materials in any and all media.  Except as provided herein, neither Party shall use the other's name or other Marks without the other's prior written approval.

12.  Confidential Information.  All information and materials received from EP or our affiliates, directors, employees, consultants, subcontractors or agents, including any information and materials about our business, products, technology, customers and suppliers, pricing and sales information and any information and materials developed or derived therefrom ("Confidential Information") shall be confidential and proprietary to, and trade secrets of, EP.  You shall hold all such Confidential Information in strict confidence, not disclose it to any party other than your employees, consultants, agents or other service providers on a need-to-know basis only, and not use it in any way for your own or any third party's benefit, without the prior written consent of EP.  The terms of this Agreement shall be deemed Confidential Information.  Without limiting the uses of Qualified Leads and Personal Information that you are expressly permitted to make hereunder, all Qualified Leads and Personal Information shall be deemed our Confidential Information.

13.  Compliance Verification.  To verify your compliance, EP shall have the right to review your performance hereunder ("Compliance Verification") if EP believes you may be engaged in any activity that does not comply with this Agreement or may not be authorized by EP.  In connection therewith, you shall cooperate with EP and/or our designee (including providing all relevant data and/or documents and meetings with your personnel, as reasonably requested by EP or our designee).  If we conclude that you have breached or are in breach of the Agreement or that your use of the Service is otherwise unsatisfactory, you shall promptly change such business practices to our satisfaction, or alternatively at our option, we may terminate this Agreement upon notice to you (without limitation to any other remedies available to EP).

14.  Non-Exclusivity; Independent Contractor.  The relationship between you and EP will be non-exclusive and either Party may enter into any business relationships with third parties, whether or not competitive with this one.  In fact, you acknowledge that the nature of the Service is such that your competitors may make bids to access the same Leads which you wish to access.  The Parties shall be deemed independent contractors.  In providing the Service, EP is not acting as your agent or representative, and nothing contained herein shall be construed as making either Party the agent of the other, as granting to either Party the right to enter into any contract on behalf of the other, or as establishing a partnership, joint venture or similar relationship between the Parties.

15.  Dispute Resolution.  In the event of any dispute or controversy arising out of or relating to this Agreement or the breach hereof, the Parties shall use reasonable efforts to settle such dispute or controversy amicably in good faith negotiations, in order to reach a just and equitable solution.  If, despite such efforts, the Parties

fail to reach an agreement within fifteen (15) days, either Party may submit the dispute or controversy to binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. The arbitration shall take place before a sole neutral arbitrator in the New York City metropolitan area, at a place and time mutually agreed by the Parties or, failing mutual agreement, selected by the arbitrator. The arbitrator shall have experience in the nature and subject matter of the dispute. Each Party shall bear its own costs and expenses of arbitration, but the arbitrator may award attorneys' fees and costs to the prevailing Party. Judgment may be entered on any award rendered by the arbitrator in any court having jurisdiction.

16. Amendment. ANY PROVISION OF THIS AGREEMENT, AND ANY ELEMENT OF THE SERVICE, MAY BE AMENDED OR MODIFIED BY EP AT ANY TIME, IN ITS SOLE DISCRETION. AMENDMENTS OR MODIFICATIONS MAY INCLUDE CHANGES IN BIDDING TERMS AND PAYMENT PROCEDURES AND CHANGES TO THE WEB SITE. EP WILL NOTIFY YOU OF ANY MATERIAL AMENDMENTS OR MODIFICATIONS IN ACCORDANCE WITH THE NOTICE PROVISIONS OF SECTION 18 HEREOF. YOUR CONTINUED USE OF THE SERVICE AFTER NOTIFICATION OF SUCH CHANGES SHALL CONSTITUTE YOUR ACCEPTANCE OF SUCH CHANGES.

17. Governing Law. This Agreement shall be governed by and construed in accordance with the Laws of the State of New York without reference to conflict of laws principles. EP makes no representation that the Service or any part thereof is appropriate or available for use by Lead Purchasers or Consumers in jurisdictions outside the United States, or that this Agreement or the Service comply with the Laws of any other country. Lead Purchasers who use the Service and are located outside the United States do so on their own initiative and at their sole risk and are responsible for compliance with applicable local Laws (in addition to all applicable United States Laws).

18. Miscellaneous. As between you and EP, except with respect to your Marks, EP owns all right, title and interest in and to the Web Site, the Qualified Leads, all Personal Information collected by EP in connection with the Service, and all other elements of the Service. EP shall not be responsible for any failure of third-party vendors, subcontractors or other service providers regarding the Service, in the absence of EP's negligence. EP shall not be liable for non-performance, delays, interruptions or loss resulting from causes out of its reasonable control, including electronic or mechanical equipment malfunction, telephone, Internet or software problems, storms or other acts of God, fires, acts of government, terrorist acts, hackers or labor strikes. This Agreement shall be binding on and for the benefit of the Parties and their respective successors and permitted assignees. You may not assign this Agreement or any of your rights and obligations hereunder without the prior written consent of EP. This Agreement is the Parties' complete agreement regarding the subject matter hereof and supersedes all prior oral and/or written discussions and agreements between the Parties with respect thereto. A waiver of any condition or term of this Agreement, or right or remedy hereunder, shall not constitute a future waiver thereof. Any provision of this Agreement necessary to interpret or enforce the rights and obligations of the Parties hereunder, including Sections 4-10, 15, 17 and 18, shall survive expiration or termination of this Agreement. If any term or other provision of

this Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect. Notices to EP from you shall be in writing, and shall be delivered in person, by facsimile, by overnight courier or by such other means that we may designate. Our address and facsimile number is Exchange Place, c/o Accoona Corp., 101 Hudson Street, Suite 3606, Jersey City, New Jersey 07302, Attn: CFO, facsimile 201-557-9377. Notices to EP shall be considered as delivered upon written confirmation of receipt or three days after mailing in the required manner. Notices to you from EP shall be made in one or more of the following ways: (a) by written notice as provided above to your address, or facsimile number as specified in your Application; (b) by e-mail to the e-mail address set forth in your Application; or (c) through a posting of the notice on the Web Site. All headings used herein are for convenience of reference only and shall not have any affect on the construction or interpretation of this Agreement. All uses of "include" or "including" herein shall be understood to mean "include [or including] without limitation". In no event shall any purchase order, insertion order, invoice or other document submitted by you concerning the subject matter hereof have any force or effect unless signed by EP.

## INFINITY PROGRAM RIDER TO
## SELLER PROGRAM TERMS & CONDITIONS

This rider ("Rider") is entered into by and between Exchange Place and you ("you" or "Ad Sales Partner") and amends and is hereby deemed incorporated into that certain Exchange Place Seller Program Terms & Conditions entered into between the parties hereto (the "Terms & Conditions"). Any defined terms used but not defined herein shall have the meanings set forth in the Terms & Conditions. In consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

The Parties hereby acknowledge and agree that you are entering into the Terms & Conditions with the intent of acquiring or managing the acquisition of Qualified Leads through the Qualification System and for those Qualified Leads not sold through the Bidding System (the process referred hereafter as the "Infinity Program") on behalf of certain direct provider(s) of the Requested Services identified by such Qualified Leads (each such direct provider on whose behalf you are so acting, a "Provider", and all such providers, the "Providers"). Providers must directly interact with consumers, or they will be considered Brokers, ineligible in participating as a Provider. The Exchange Place Infinity Program allows you and any of your Providers, to purchase and acquire Qualified Leads outside of the Service's Bidding System, based upon a sales order ("Insertion Order") specifying the negotiated pricing and quantities, and any other contractual specifications. Therefore, notwithstanding anything to the contrary contained in the Terms & Conditions:

1.      Unless otherwise agreed by Exchange Place, you shall be allowed to purchase and acquire Qualified Leads on behalf of any Provider once Exchange Place has approved of (i) such Provider's account (ii) the Qualified Lead Listings selected by such Provider or by you on such Provider's behalf. In no event shall you purchase Qualified Leads on behalf of, or provide a Qualified Lead to, any Provider that you know (or reasonably should have known) does not have any required Authorization(s) to provide the Requested Services identified by such Qualified Lead. References in the Terms & Conditions to your selection of Qualified Lead Listings, negotiated pricing and quantities, or other receipt of Qualified Leads (if applicable) shall be understood to refer to such actions taken by you on behalf of the applicable Provider.

2.      Sections 1(C)(i), 1(C)(ii) and 1(C)(iii) refer to Lead Purchaser(s) who participate through the Service's Bidding System. Providers within the Infinity Program do not bid for Qualified Leads, therefore the terms and conditions on pricing and delivery of Qualified Leads based on bidding shall be disregarded.

3.      Sections 1(C)(iv) and 9 refer to term and termination. In defining timing expectations for specified actions by Exchange Place, the Section 1(C)(iv)(C) refers specifically to a cancellation policy that does not apply to the Infinity Program and is hereby deleted, as the term of the agreement is defined within the Insertion Order. More specifically, Section 9 is hereby deemed deleted and replaced with the following:

"9.  Term and Termination.  This Agreement will commence on the date on which Exchange Place notifies you that you and your identified Provider(s) have been accepted for participation in the Infinity Program and Exchange Place Service, and will end when terminated by either Party for any reason. However, Insertion Orders shall define the individual contracted start and end dates for the purchase and acquisition of Qualified Lead Listings, their pricing and quantities. Termination of this Agreement shall only be possible once any outstanding Insertion Order has been fulfilled. You shall be responsible for all such amount(s) owed by you to Exchange Place hereunder as of the end date of such Insertion Order. Exchange Place expressly reserves the right to discontinue, suspend or terminate the Service (or any part thereof), if and when it has been determined by Exchange Place, that there has been a breach of this Agreement.

4.      Sections 3(B) and 3(C) are hereby deemed deleted and replaced with the following:

"(B)    Exchange Place has no control over or oversight of, and will not participate or otherwise be involved in or assist with, your communications, negotiations, transactions, agreements (including compensation terms) or other dealings (collectively, "Dealings") with any Providers. Your Dealings with any Provider are solely between you and such Provider. You agree that neither Exchange Place nor any Exchange Place Parties (as defined below) will be responsible or liable for any damages, costs, expenses or other loss or liability of any sort arising out of or in any way connected with any Dealings you may have with any Provider."

5.    In the last sentence of Section 4(D), in Section 7(A)(ii) and in the first two sentences of Section 7(B), references to "you" and "your" shall be understood to refer to the applicable Provider and not to you, pursuant to the fact that you may not contact or have any other Dealings with any Consumers hereunder. In Section 6(C), the last sentence of Section 7(B) and Section 10, the term "Consumer" or "Consumers" is hereby deemed replaced with the term "Provider" or "Providers", respectively.

6.    Sections 5(A) and 5(B) of the Terms & Conditions are hereby deemed deleted and replaced with the following:

"(A)    <u>Limited Use</u>. With respect to any Qualified Lead and the Personal Information contained therein that Exchange Place may provide to you hereunder, you may provide an individual Qualified Lead and Personal Information to a single Provider, unless otherwise specified in the Insertion Order. Notwithstanding the foregoing or anything to the contrary contained in the Terms & Conditions, it is understood that you and Exchange Place shall mutually agree on whether Exchange Place shall provide any such Qualified Lead and Personal Information to you or directly to such Provider. In no event shall you share any Qualified Lead or any Personal Information contained therein with any other Provider or third party. You shall not use any Qualified Lead or any Personal Information contained therein at any time (i) to contact any Consumer, (ii) for your own benefit or purposes, including to market any of your products or services or otherwise engage in any marketing activities, by any means, or (iii) for any other purpose not expressly permitted hereunder. You acknowledge that your use of any Qualified Lead or any Personal Information contained therein beyond the uses permitted hereunder may constitute a violation of telemarketing or other Laws.

You acknowledge and agree that we may monitor your use of Qualified Leads provided to you hereunder to ensure your compliance with this Section of these Terms & Conditions. One means by which we may do so is by seeding certain Qualified Leads or creating "dummy" Qualified Leads (provided that we will provide you with a refund, or not invoice you, for such seeded or dummy Qualified Leads)."

7.    The following provisions are hereby deemed deleted from the Terms & Conditions: (i) in Section 6(D), the clause commencing with ", including the messaging" and ending with "confirmation page,", which shall be deemed replaced with the words "(including any Marks of any Providers)"; (ii) Section 6(E); (iii) Section 6(H); (iv) in the first sentence of Section 12(A), the words "in connection with certain services or products that you may offer to Consumers", which shall be deemed replaced with the words "(including any Marks of any Providers)"; and (v) in the first sentence of Section 14, the words "brokering or reselling", which shall be deemed replace with the word "misusing".

8.    Section 6(G) is hereby deemed deleted and replaced with the following:

"(i) You have all licenses, qualifications, permits, registrations and other authorizations and have satisfied any other licensing or similar requirements (collectively, "Authorizations") that are required in order for you to (A) conduct your business, (B) pay Exchange Place in accordance with the terms hereof, and (C) participate in the Service on behalf of Providers (including any such requirements imposed by any state or other geographic territory or jurisdiction as a condition to conducting your business in such state or other territory or jurisdiction), including posting or securing all bonds and other financial instruments or deposits required by any applicable Laws; (ii) such Authorizations are and will remain current, valid and in full force and effect at all times while you use the Service; and (iii) you are not the subject of any governmental inquiry or investigation, or any litigation or other proceeding, regarding any Authorization."

9.    In Section 7(A), "Lead Purchasers" shall be understood to refer only to Providers and not to any Ad Sales Partners.

10.    In the event that any Provider wishes to use the Service directly and not through you as an Ad Sales Partner, we shall have the right to offer the Service directly to such Provider, and nothing contained in these Terms & Conditions shall be deemed to prevent or otherwise restrict our right to do so. In such event, these Terms & Conditions shall be deemed terminated solely with respect to your services hereunder on behalf of such Provider, unless the Parties otherwise agree. Except as set forth in the immediately preceding sentence, in the event that the Terms & Conditions are terminated by either Party, such termination shall also terminate the account of any Providers on whose behalf you are using the Service, and you shall promptly notify such Providers of such termination. In the event that you terminate your relationship with any Provider, you shall promptly notify us of such termination.

The amendments set forth above are hereby incorporated into the Terms & Conditions. Except as modified above, the Terms & Conditions shall remain in full force and effect and apply to your use of the Service.

IN WITNESS WHEREOF, Ad Sales Partner and Exchange Place have each caused this Rider to be signed and delivered by its duly authorized officer, all as of the date last set forth below.

|  | POAP CORP D/B/A EXCHANGE PLACE |
|---|---|
| By: | By: |
| Name: | Name: |
| Title: | Title: |
| Date: | Date: |



**Infinity Program**

## INSERTION ORDER

Partner Client Name: Norvax Inc.

| | |
|---|---|
| Partner Name: Adexial LLC | Exchange Place |
| Address: 777 Shotgun Rd | Sales Rep Kevin Van Lenten |
| City, State, Zip: Sunrise, FL | Address 101 Hudson St. Suite 3606 |
| Contact Name David Plante | City, State, Zip Jersey City, NJ 07302 |
| Phone 954 805 4325 | Phone 201-557-9366 |
| Fax | Fax 201-557-7292 |
| Email david@adexial.com | Email kvanlenten@accoona.com |

Start Date: 11/13/2006
End Date: Upon completion of delivery

Payment Type: **Invoice to pay**    *Information on File*

| Qualified Lead Listing | Lead Type | Region(s) | Price Per Lead | Quantity Per Day | Cost | Days of Delivery | Monthly Cost |
|---|---|---|---|---|---|---|---|
| 1 | Diabetes | U.S. All States | $8 | 400 | $ 3,200.00 | 30 | $ 96,000.00 |
| 2 | | | | | $ - | | |
| 3 | | | | | $ - | | |
| 4 | | | | | $ - | | |
| 5 | | | | | $ - | | |
| 6 | | | | | $ - | | |
| 7 | | | | | $ - | | |
| Total Order Amount | | $8 Price Per Lead | | 12000 Leads | | | $ 96,000.00 |

Specific questions and answer sets to be received as part of lead data delivery.  Posting instructions provided by Diabetic Plus.

### PLEASE PRINT OUT, SIGN AND RETURN FAX TO 201-557-7292

Your signature insures that you have signed the Exchange Place Seller Program Terms & Conditions and Infinity Program Rider, and will execute this Insertion Order. Once you have signed this Insertion Order, you agree to be billed for the receipt of Qualified Leads as defined above by the Qualified Lead Listing criteria, and rates for pricing and quantity. Daily quantity may be adjusted by Exchange Place by email notification.

Special Terms and Conditions: Leads are exclusive / Leads are pre-emptable / Leads may be distributed a maximum of 4 times

| | | | |
|---|---|---|---|
| Company: | ADEXIAL LLC | | POAP Corp / dba Exchange Place |
| Name: | David Plante | Name: | Kevin Van Lenten |
| Title: | President/Owner | Title: | Director of Sales |
| Signature | | Signature | |
| Date | 11/10/2006 | Date | 11/10/2006 |

# EXHIBIT B

# AMERICAN ARBITRATION ASSOCIATION
## Commercial Arbitration Tribunal

In the Matter of the Arbitration between

Re: 13 181 01258 07
   POAP Inc. d/b/a Exchange Place
   and
   Adexial LLC

## AWARD OF ARBITRATOR

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into by the parties, dated November 13, 2006, and having been duly sworn, and the oral hearings having been waived in accordance with the Rules, and having fully reviewed and considered the written documents submitted to me by Claimant, and Respondent having failed to submit documents after due notice in accordance with the Rules hereby, AWARD as follows:

### DISCUSSION

The parties entered into a written agreement on November 13, 2006 ("Agreement"), whereby Claimant POAP Inc. d/b/a Exchange Place ("POAP") agreed to provide Respondent Adexial LLC ("Adexial") with qualified leads for diabetes products in return for specified payments. Adexial soon fell into arrears - - ultimately totalling $173,062.40 - - which Claimant commenced this arbitration proceeding to collect in accordance with the Agreement. Adexial declined to participate in the arbitration.

POAP has submitted competent evidence establishing that it provided the services for which Adexial was billed, that invoices were duly issued to Adexial, and that the outstanding balance owed by Adexial is $173,062.40.

The Agreement entitles POAP to recover interest on all amounts owed at the lesser of the highest legal rate or 18 per cent per annum. POAP has submitted an interest calculation based on a rate of 9 per cent per annum, which is the statutory interest rate in New York, and which I accept as valid under the Agreement. Adopting POAP's calculation which seeks $11,078.25 through October 30, 2007, and adding 16 days of interest to this amount to award interest through the date of this Award at a rate of $29.98 per day, interest is awarded in the amount of $11,557.93.

In the Matter of the Arbitration between

Re: 13 181 01258 07
    POAP Inc. d/b/a Exchange Place
    and
    Adexial LLC

The Agreement, at para. 15, gives the Arbitrator discretion to award attorney's fees and costs to the prevailing party. POAP has submitted competent evidence establishing that it has incurred legal fees related to Adexial's breach of the Agreement in the amount of $13,365.50. I find this amount to be reasonable.

AWARD

Within 15 days from the date of this Award, Respondent shall pay to Claimant: a) the sum of $173,062.40 [ONE HUNDRED SEVENTY THREE THOUSAND SIXTY TWO DOLLARS AND FORTY CENTS]; b) interest on that sum in the amount of $11,557.93; and c) $13,365.50 in attorney's fees, for a total of $197,985.83.

ADMINISTRATIVE FEES

The administrative fees of the American Arbitration Association totaling $2,750.00, and the compensation of the arbitrator totaling $1,110.00 shall be borne by Respondent. Therefore, Respondent shall reimburse Claimant the sum of $3,860.00, representing that portion of said fees in excess of the apportioned costs previously incurred by Claimant.

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby, denied.

Nov. 15, 2007
Date                                        Abigail Pessen

I, Abigail Pessen, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

Nov. 15, 2007
Date                                        Abigail Pessen

Page 2 of 2

RECEIVED TIME NOV 15 12.11PM